Westcott v. Middleton.

---

EBENEZER WESTCOTT

*v.*

FRANK P. MIDDLETON.

1. The burden of showing that an undertaker's establishment, in which he keeps coffins, ice-boxes, and cases in which he preserves the bodies of the dead, and in the rear of which he cleanses and dries such boxes, is a nuisance, is on the complainant

2. Such an establishment, in a populous place, is not a nuisance *per se.*

3. If a single person, of a most sensitive taste on the subject, is seriously disturbed thereby, and no others are called who have been annoyed, a case is not made requiring the interference of the court.

4. Physical discomfort, arising from a morbid taste or an excited imagination, as distinguished from such discomfort arising through the organs of sense common to all, is not enough to justify the court in closing such an establishment.

On bill, answer and proofs.

*Mr. J. J. Crandall,* for complainant.

*Mr. E. A. Armstrong,* for defendant.

Bird, V. C.

The parties to this controversy own adjoining lots in the city of Camden. The complainant occupies his as a dwelling-house and for offices. The defendant occupies the basement and first floor of his dwelling to carry on the business of an undertaker, using the front room as an office, the second room as a place to keep supplies, and the second and third stories with his family. On the lot of the defendant, back of the first and second rooms, is a kitchen or extension, between which and the lot of the defendant is an open space going back to the rear of the lot, which is one hundred and eighty feet deep. In this open space is a hydrant. The cellar of the defendant is used for storing lumber, which, as occasion requires, he takes out in the rear, through this open space, to a shop which is at the extreme rear end of his lot, there to be used in making boxes. The complaint is, that the defendant is guilty of maintaining a nuisance in the maintenance of this business of undertaking, and that the complainant is entitled to the aid of this court in being relieved therefrom. There is a charge that the defendant disturbs the complainant in the manufacture of boxes. This point is practically abandoned. But the complainant insists, in the first place, that this business is carried on in an unlawful manner; and, in the second place, that the defendant has no right to carry on this business where he does. The proof shows that the defendant buries from one hundred to one hundred and fifty persons a year, and the vehicles which he uses for that purpose are driving to and from his place of residence about four times in every case, so that, from five to six hundred times during the year, the complainant has the opportunity, if he attends thereto, to be reminded that a death has taken place, that some one is a corpse, and that preparations are being made for the funeral, or that some one has just been buried. In every such case the defendant uses a large box, in which the corpse is preserved,

as far as possible, from decomposition, by the use of ice in another box, made of tin, which is placed directly over the corpse. Formerly the tin box opened underneath, by a tube running down through the box containing the body, to carry off the water as the ice melted. This is now dispensed with, so that there is no connection whatsoever between the ice and the corpse. These boxes, which are so used to preserve the body, are taken, after the burial, to the residence of the defendant, through his office and store to the rear thereof, and, in this narrow space, by the side of the hydrant, are often washed; and, if not washed there, are washed further back in the yard. They have been allowed to remain there for an hour, and sometimes longer—occasionally all night. The complainant insists that he has several times noticed offensive odors from those boxes, which have greatly distressed him and given him alarm. Indeed, it may be said that there is no doubt but that the complainant has been frequently exercised in his mind on account of the presence of these boxes, which have been receptacles of the dead. Nor is there any doubt but that he has observed offensive odors, but whether from these boxes or not, is not so clear to my mind. There were odors arising from that locality, but the defendant insists that they came from a drain which he found to be choked up on two occasions; and that, after the drain had been opened and cleansed, there were no longer any odors. The complainant insists that these odors were of the character that he says they were, because flies were attracted there in great numbers, among which was what is known as the blow fly, which is supposed, according to the testimony, more likely to be attracted to places where there is animal decomposition than the ordinary fly.

The defendant admits the use of his premises for the purposes alleged in the bill. He also admits placing the boxes referred to immediately in the rear of the main part of his house, and by the hydrant in question, and of cleansing them there. But he insists that they were never allowed to remain there any longer than was necessary before they were thoroughly cleansed and dried, and, when cleansed and so dried, were immediately taken away and put under cover. He says also that he never takes to

Westcott v. Middleton.

this place of business any box which has been used in case the corpse was of a person who had died of any contagious disease, without first thoroughly cleansing the box. The defendant has also shown that on two occasions the drain referred to was so stopped up as to produce offensive odors, which were not perceived when the drain was open. So, that, after the fullest consideration, my mind is led to the conviction that the odors complained of may have arisen from some other source than that alleged by the complainant. In other words, I am not satisfied that the defendant has conducted his business in such an unlawful manner as to cause any undue annoyance or discomfort to the complainant.

But the further contention that the business itself is a nuisance is of great importance, and cannot be passed by without the fullest consideration. The claim is, that it is impossible to carry on a business of this character without constant liability to communicate diseases to those who reside in the neighborhood, and that this liability creates dread, discomfort and apprehension, which abridges the rights of property. It is insisted that the deadly spore will, in spite of the utmost precaution, be carried about in such vessels, and are liable to be dislodged, and to be communicated to the nearest inhabitant at any moment, impregnating him with the seeds of death. In the first place, admitting the possibility of danger lurking in every box where the person buried therefrom has died of a contagious disease, what is the duty of the court? Should the court say that such business, however lawful, cannot be carried on in the populous part of a city? I am not prepared to assent to that doctrine. It is quite clear to my mind that this, like many other occupations, may be so conducted as to be a nuisance. For example, a grocer might allow his vegetables to decay in such quantities and in such localities upon his premises as to do infinite harm to his neighbors, and subject him to the penalties of the law, or to the restraint of a court of equity. The same may be said of the vendor of meats ; so negligent might he be as to scatter disease and death to multitudes. But because these things are possible, or may occasionally happen, it is not pretended for a moment that it is

Westcott v. Middleton.

unlawful to carry on the grocery business, or to vend meats in the populous parts of our cities. It seems to me that the same reasoning may be applied, with great certainty, to the business of undertaking. It may be carried on so negligently, with such indifferent regard to the rights and feelings of others, as to be not only an offence to the tender sensibilities of the intelligent and refined, but to be a direct menace to the health, and open violation of the civil rights of all residing in the neighborhood. Now, as in the cases supposed, there is a remedy which does not go to the destruction of the occupation, but which, at the same time, protects the rights of others in the comfortable enjoyment of their property, so, in the case in hand, it seems to me most clear that the court has it within its power to prevent the misapplication of a legal right, and that to go further would be a destruction of that legal right. The law means to protect every one in the enjoyment of such rights; in the enjoyment of his health, as well as in the enjoyment of his property, on the one hand, and, on the other, in the enjoyment of his legitimate vocation, as well as in the possession of his property. The defendant has a right to the possession of his property. And to carry on a legitimate business there, in a lawful manner, is an equally sacred right. Is the business in which the defendant is engaged a lawful one? To a certain extent that is not disputed. Has he a right to carry it on on the premises which he owns and occupies? He certainly has, unless it unreasonably interferes with the lawful rights of another. The counsel for the complainant, perceiving the force of this view, and what would be likely to result therefrom under the evidence, insisted, at last, that carrying on the business of an undertaker, by the defendant, was, in itself, so obnoxious to the complainant as to render his house uncomfortable, and that that fact alone was sufficient to justify this court in restraining the defendant from the use of his premises in carrying on said business. But it has not been shown that disease of any kind has ever been communicated by any act or omission of the defendant. It is not in evidence that the fatal spore has ever been allowed to remain in any of the boxes which the defendant and his employees have handled as

children do their toys. Nor does it anywhere appear that any special risk has been presented in the management of this business. Therefore, as to the first question, I must conclude that the complainant cannot prevail.

In the second place, it is urged that the business of an undertaker is a nuisance *per se.* Is this proposition maintainable? Must the undertaker retire from the inhabited parts of our villages, towns and cities? Is an occupation which is absolutely essential to the welfare of society to be condemned by the courts, to be classified with nuisances, and to be expelled from localities where all other innocent and innoxious trades may be carried on? In other words, is this business so detestable in itself as unreasonably to interfere with the civil rights or property rights of those who dwell within ordinary limits, and who can and do, without effort, see and hear what is being done? The inquiry is not whether it is obnoxious to this or that individual or not; but whether or not it is of such a character as to be obnoxious to mankind generally, similarly situated. There are certain obscene or offensive sights, certain poisonous or destructive gases or odors, certain disturbing sounds or noises, which affect most persons alike. Can the business of an undertaker be classed with any of these? Is the business of an undertaker of this class? Before the court can condemn a trade or calling, it must appear that it cannot be carried on without working injury or hurt to another; and, as I have said, that injury or hurt must be such as would affect all reasonable persons alike, similarly situated. The law does not contemplate rules for the protection of every individual wish, or desire, or taste. It is not within the judicial scheme to make things pleasant or agreeable for all the citizens of the state.

But to proceed with the case before me. Let us ascertain from what standpoint, or under what circumstances, the complainant regards this employment a nuisance *per se.* Mr. Westcott is one of the most highly respected citizens. He is about seventy-two years old. As to the subject matter in hand, and everything akin to it, he is most sensitive or tender. It is conceded that he has an extraordinary horror or repugnance to contemplating any-

Westcott v. Middleton.

thing pertaining to death or to the dead. Such emotions or feelings so control him that he has not attended a half dozen funerals during his long life. As he advances in years, this sentiment becomes more and more intolerable. It is urged, and with great reason, that these facts being so, Mr. Westcott's judgment is not only overcome by his imagination, but that innumerable evils are created thereby for his soul to feed upon, which he charges in this case to the defendant. Plainly, the circumstances are special, and most unsafe to found any general rule of law upon.

Giving the complainant credit for all he can possibly be entitled to, and keeping in mind what he actually suffers, whether justly or unjustly, whether it be the result of imagination or an over-sensitive nature or not, and also keeping in mind the rights of the defendant, how far can the court go with safety in protecting Mr. Westcott in his home, and securing to him every comfort that a citizen is entitled to in the enjoyment of that home? Many observations which have been made, in disposing of the first branch of the discussion, are equally applicable here; they will not be repeated. The court, in disposing of every such question, cannot but at once look beyond the judgment to be given in the particular case; the court cannot but inquire what next or where will such judgment lead to? The inquiry inevitably arises, If a decision is rendered in Mr. Westcott's favor because he is so morally or mentally constituted that the particular business complained of is an offence or a nuisance to him, or destructive to his comfort or his enjoyment of his home, how many other cases will arise and claim the benefit of the same principle, however different the facts may be, or whatever may be the mental condition of the party complaining? One may complain of the smell of vegetables, another of fresh meats, another of the ordinary sound of the anvil, another of the running of a saw, or the humming of machinery and the like, without limit, every case being as meritorious as the one now under consideration. Hence the value of general principles can never be lost sight of. A wide range has indeed been given to courts of equity in dealing with these matters, but I can find

no case where the court has extended aid unless the act complained of was, as I have above said, of a nature to affect all reasonable persons, similarly situated, alike.

My attention has been called to the case of *Penna. R. R. Co.* v. *Angel, 14 Stew. Eq. 316.* The principle there laid down is of great value in every such case. The defendant was engaged in a lawful business, but so used its tracks in making up its trains and distributing the cars in front of the complainant's dwelling that, by reason of stenches, noises, smoke, steam and the dirt thereby occasioned, the comfort of the complainant's home was seriously impaired. The court below allowed an injunction against such use of the road. But the court did not pretend to hold that the company must abandon the use of its tracks altogether. It was only decided that the company had no right to allow its engines or its cars to remain in the presence of, or near by, the house of the complainants, making hideous noises, emitting smoke and steam and unwholesome odors, to the great discomfort of the complainant in his home. The judgment of the court simply looked to the proper exercise of the lawful rights of the defendant, and in the lawful exercise of those rights, what inconvenience or annoyance the complainants might suffer, they must submit to. Engines in passing might whistle or emit smoke, steam and dirt, cattle might bellow, sheep bleat and hogs squeal, but to that extent the complainants must yield to the general demand. To this extent the court was sustained on appeal. I can find nothing in that case to lead me to say that the business of an undertaker is a nuisance *per se.*

My attention has also been directed to *Cleveland* v. *Citizens Gas Light Co., 5 C. E. Gr. 201,* in support of complainant's views. In that case the court held: "Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained. * * * To live comfortably is the chief and most reasonable object of men in acquiring property as the means of attaining it; and any interference with our neighbor in the comfortable enjoyment of life is a wrong which the law will redress. The only question is what amounts to

Westcott v. Middleton.

that discomfort from which the law will protect." The learned chancellor then made this important observation: "The discomfort must be physical, not such as depends on taste or imagination. But whatever is offensive, physically, to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort." For a strikingly similar definition, see *Walter* v. *Selfe, 15 Jur. 416, 4 Eng. L. & Eq. 15.*

In this case, then, we have the broad, yet perfectly perceptible or tangible ground or principle announced, that the injury must be *physical,* as distinguished from one purely *imaginative;* it must be something that produces real discomfort or annoyance through the medium of the senses, not from delicacy of taste or a refined fancy. This is very comprehensive; indeed, I cannot conceive of a more liberal or broad statement of the law; yet I apprehend it is a true delineation of the law. How, therefore, shall I apply this rule? I must find that physical discomfort has been produced, or will be; but, in so doing, I must not forget the influence of the imagination or of a morbid or abnormal taste on the mind and body. What has been disclosed by the proofs? These facts: Mr. Westcott and the defendant have lived side by side, in these same houses, for about eleven years. During all this time, the latter has carried on this business of burying the dead in about the same open and unpretentious manner that he now does. There is no evidence that Mr. Westcott or any other person has ever been afflicted by reason of the defendant's occupation. Indeed, nothing has been attempted in that direction. Yet it is admitted that this trade has been and is carried on by the defendant in the midst of the most populous part of the city of Camden.

And what, to my mind, is of very great consequence, in considering whether this trade affects the body of Mr. Westcott through what is known as the bodily senses, or through his imagination or taste, is the fact that not another person has been produced who has been affected as he has been. As just stated, great numbers, from day to day, look upon this establishment

Westcott v. Middleton.

just as Mr. Westcott does, although at a greater distance; but
if the injury results from *seeing* these evidences of the havoc of
disease and of death, then surely distance cannot mitigate it;
and while so many others have been subject to the same influences,
not one has been offered to say that he has suffered any annoy-
ance or discomfort by the presence of this employment in the
neighborhood. And although the business of undertaking,
caring for, and burying the dead has been conducted in about the
same manner from the earliest times (that is, in an open and
public manner, in the town and city, as well as in the country),
and so continues to be, where the most refined and cultivated
abide, as well as where the unpretentious do, yet from no class
has any one been brought to testify to any bodily or mental
injury or suffering, because an undertaker was carrying on his
vocation in his neighborhood.

Hence, in my judgment, before a trade or business can be de-
clared to be a nuisance *per se*, it must be made to appear that it
necessarily works injury, discomfort or annoyance to the property
or persons of citizens generally, who may be so circumstanced as
to come within its influence. It is not enough that only one per-
son, and that one the complainant, alleges discomfort; and cer-
tainly his case is greatly weakened when he admits that so sen-
sitive is he on the subject that in seventy-two years he has not
attended a half-dozen funerals. If the court can compel this de-
fendant to cease his trade next door to Mr. Westcott, because the
sight of these instruments used in burying the dead have an un-
healthy influence on his mind, then the vender of crape, and the
artist who cuts tombstones and monuments, will inevitably be
liable to the same condemnation. See *Demarest* v. *Hardham, 7
Stew. Eq. 469, 474.*

Perhaps I ought to remark that the case of *Barnes* v. *Hathorn,
54 Me. 124,* so much relied on by counsel of the complainant,
rested on a very different state of facts—in this: that there was
not only a tomb on the land of the defendant, within forty-four
feet of the dining room of the plaintiff, but that, at the time of
the action, the defendant had a dead body in it, and it was shown
that once before it had six deposited therein, and that experts

swore that effluvia, injurious to health, escaped therefrom. Nor is the case of *Clark* v. *Lawrence, 6 Jones Eq. 83,* in any sense like the one before me.

The results of my inquiries are, that, while the defendant has no right to conduct his business so as to endanger or threaten the health of the complainant, or to make his home uncomfortable, either by filling the air with noxious vapors, or the germs or seeds of disease, the evidence does not show that he has done either, and that the business of an undertaker is not a nuisance *per se.*

The bill should be dismissed, with costs.