15436

FRASER *ET AL.* v. FRED PARKER FUNERAL HOME

(21 S. E. (2d), 577)

92

100

104

*Mr. George Warren,* of Hampton, *Mr. Heber R. Padgett,* of Walterboro, and *Mr. John W. Crews, Mr. D. W. Robinson, Jr.,* and *Mr. Jos. L. Nettles, Jr.,* all of Columbia, counsel for appellant,

*Mr. Randolph Murdaugh, Jr.,* of Hampton, *Mr. I. A. Smoak* of Walterboro, *Mr. Samuel L. Prince* of Anderson, and *Mr. D. McK. Winter,* of Columbia, counsel for respondent,

Counsel for appellant, in reply,

MR. CHIEF JUSTICE BONHAM:

I am unable to concur in the opinion of Mr. Acting Associate Justice Lide. For the reason stated in the decree of Judge Greene, I concur in it.

MR. ASSOCIATE JUSTICE STUKES and CIRCUIT JUDGE G. DEWEY OXNER, ACTING ASSOCIATE JUSTICE, concur.

MR. ASSOCIATE JUSTICE STUKES (concurring):

In the absence of a zoning ordinance or other control, as here, I think each such case should be decided upon its own particular facts (87 A. L. R., 1061), which is the final conclusion announced in the opinion of Mr. Acting Associate Justice Lide, and I am in accord with it. However, I do not agree that the evidence in this case warrants the reversal of the findings contained in the Circuit decree, so I join the Chief Justice in favoring its affirmance.

CIRCUIT JUDGE G. DEWEY OXNER, ACTING ASSOCIATE JUSTICE (concurring):

I am of opinion that the judgment of the Circuit Court should be affirmed. In reaching this conclusion I have considered the portion of Wichman Street involved as a residential area. Such was the conclusion of fact found by the Special Master, who probably made a careful inspection of Wichman Street and who had the benefit of seeing and observing the witnesses. This finding of fact was confirmed by the Circuit Judge.

While the decisions upon the question are widely divergent, I think the view adopted by the Circuit Judge is in accord with the great weight of authority and is sound in principle. His view is also in accord with the modern trend of the decisions in those jurisdictions where the precise question arose as one of first impression. *Jordan et al. v. Nesmith et al.,* 132 Okl., 226, 269 P., 1096; *Williams et al. v. Montgomery et al.,* 184 Miss., 547, 186 So., 302; *Albright et al. v. Crim et al.,* 97 Ind. App., 388, 185 N. E., 304; *Arthur et al. v. Virkler et al.,* 144 Misc., 483, 258 N. Y. S., 886.

I think the following language from the recent case of *Kundinger et al. v. Bagnasco et al.,* 298 Mich., 15, 298 N. W., 386, 387, decided in June, 1941, clearly and correctly sets forth the applicable principles of law: "It requires no expert opinion to reach the conclusion that a funeral establishment, as a constant reminder of death, has a depressing influence upon most people. Funerals, hearses, coffins, the keeping of dead bodies on the premises, the comings and goings of bereaved persons, are conducive to depression, and sorrow, and deprive a home of the comfort and repose to which its owners are entitled. It is not necessary to show danger from disease or unpleasantness of odors arising from the maintenance of such a business in order to enjoin it. *Arthur v. Virkler,* 144 Misc. 483, 258 N. Y. S. 886; *Williams v. Montgomery,* 184 Miss. 547, 186 So. 302. Emotions, caused by the constant contempla-

tion of death, as well as the realization that the bodies of deceased persons are often, if not continuously, on such premises as those here in question, are more acute in their painfulness, in many cases, than suffering perceived through the senses; and mental pain and suffering are elements of damage, in the eyes of the law. Where there can be said to be a long-established residential district, such as in this case, the intrusion of the funeral business therein will be restrained as a nuisance by injunction."

In reaching a conclusion in a case of this kind it is necessary to bear in mind the particular facts involved. Cases may arise in a residential area where those complaining are so far removed that they could not reasonably be said to be affected, or where they have allowed a funeral home to be permanently established and remain for an appreciable length of time unchallenged. We are not dealing now with cases of the kind just mentioned. Under the facts found by the Special Master and Circuit Judge, I think the injunction sought should be granted.

CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE (dissenting):

This action was brought to enjoin the operation of a funeral home at a certain place in Walterboro. The respondents were the plaintiffs in the Court below, and will be hereinafter referred to as such; and the appellant, which was the defendant in the Court below, will likewise be hereinafter referred to as such. The defendant is a corporation, the property and business of which are owned and controlled by D. Fred Parker and his wife, and hence Mr. Parker may sometimes be referred to as though he were the defendant. The case comes to this Court upon defendant's appeal from the decree of Judge Greene granting a permanent injunction.

The complaint alleges *inter alia* that the plaintiffs are property owners or have interests in property on Wichman Street, in the Town of Walterboro, and that "on or about the        day of December, 1939", the defendant re-

ceived a license from the Town of Walterboro to conduct a funeral home on Wichman Street, and thereupon the Fred Parker Funeral Home was removed from its location in the business area of the town and operated in the residence of Mr. Parker at 156 Wichman Street, and that it "has been and is being continually operated at the said location."

It is further alleged that the location is in an essentially and exclusively residential section and: "That because of the fact that said Funeral Home is located in this residential section, the plaintiffs residing in said section are almost daily brought into close association with the moving and embalming of dead bodies, funerals, and the harrowing or distressing incidents of death, causing them to suffer great mental anguish, physical discomforts, thereby affecting their health and disturbing the peace and comfort of their homes and causing their property to decrease in value, tending to disrupt domestic help, to mortify and depress growing children, and causing other damage."

It was then alleged that the acts of the defendant constitute a continuing nuisance causing irreparable damages for which the plaintiffs have no adequate remedy at law, and the prayer is for injunction and general relief.

Upon this complaint, which was duly verified, a temporary order of injunction was granted by Honorable J. Henry Johnson, resident Circuit Judge, dated April 26, 1940. In due time the defendant interposed a demurrer to the complaint upon the ground that it showed upon the face thereof that the town council had granted a license for the operation of the funeral home involved, and that the plaintiffs have an adequate remedy at law; and the defendant also moved for a dissolution of the temporary injunction. Judge Johnson, however, overruled the demurrer and refused the motion to dissolve (but increased the injunction bond) by order dated May 10, 1940.

The defendant's answer is full and elaborate, denying the allegations charging it with the creation of a nuisance, but admitting that pursuant to the license granted by the

Town of Walterboro, the funeral home was located at 156 Wichman Street, and alleging that it had been conducted at that place since December 18, 1939, "in a quiet, peaceful, unostentatious manner, and in accordance with the strictest sanitary requirements, and in a manner that would cause no normal person to have any grievance whatsoever by reason of their proximity to the said Funeral Home."

The answer also further sets up affirmatively the defendant's method of operating the funeral home, and among other things it is alleged: "That the location of the Fred Parker Funeral Home is in the residence occupied by D. Fred Parker and his family; that the bodies of persons deceased are carried to the rear of the residence of the said Parker family by way of a side street and the entry-way to said side street, and that no person or persons who live on Wichman Street have any view whatsoever of any loading or unloading of deceased persons at said funeral home; that the rooms that are used for preparation of the bodies of deceased persons are at the rear of said residence and are not in proximity to the said Wichman Street; the windows of the preparation room are so located that it would be impossible for anyone from the outside to have any view whatsoever of any work in the interior. The front of said funeral home is the front of a normal residence, the rooms in the front portion of the house being an office and two living rooms. In front of said residence and funeral home are trees, shrubbery and flowers. That none of the work of the Fred Parker Funeral Home is conducted from the front of said residence, except the entry of persons calling at said home and those departing therefrom."

It is further alleged that there had been no zoning ordinances passed in the Town of Walterboro forbidding the location in question of defendant's funeral home, but on the contrary the legal authorities vested with power had granted the defendant a license to own and operate the same at the place in question, and that the location "is not exclusively in a residential section." And it is further alleged: "That

defendant on receiving its license has expended in betterments and improvements to its said property at said place, for the purposes for which it was thereunto licensed, several hundred dollars, has beautified the grounds around the residence and funeral home, and has so constructed the same that the public and those living in the neighborhood will not be exposed to any association with the dead, nor to any harrowing or distressing incidents of death; and this defendant alleges that any grievances that plaintiffs may have in connection with the location of said funeral home at said place is purely fancied and imaginary."

And there are other allegations in the answer which need not be mentioned here, except that the defendant affirmatively alleged that the plaintiffs have an ample remedy at law by petition for revocation of the defendant's license, and that they had prior to the commencement of the action taken steps to invoke such a remedy.

On June 28, 1940, the cause was by order of Court, including all issues of· fact and of law, referred to Honorable R. P. Searson, as Special Master, who after taking the testimony offered by the respective parties, the volume of which is quite considerable, filed his report dated March 7, 1941, in which he found as a matter of fact that the portion of Wichman Street to which all the allegations of the pleadings relate is a residential area, and: "That the defendant's funeral home was at the time of the filing of the complaint, conducted in the said area under modern scientific and sanitary methods, and in an unostentatious and considerate manner appropriate to the administration of a dignified and necessary calling." And the report contains a discriminating discussion of the law involved, upon which, in the light of the evidence, it was recommended that the temporary injunction be' dissolved and the relief prayed for in the complaint refused.

Upon exceptions to this report filed by counsel for the plaintiffs, the cause was heard by Honorable G. B. Greene, presiding Judge, who handed down his decree dated July

11, 1941, permanently enjoining the defendant, its agents, servants and successors, from using the premises and buildings described and referred to in the complaint as No. 156 Wichman Street, in Walterboro, or any part of such premises and buildings, "as and for an undertaking establishment, funeral home or morgue." (It should be observed, however, that there is no testimony in the record which would sustain any charge that a morgue in the ordinary sense of that word had been ·or was intended to be operated in the place in question. Indeed, there is no such charge in the complaint.) Judge Greene does not sharply disagree with the Special Master on the facts, but he interprets them in the light of his contrasting views as to the applicable legal principles.

The order of Judge Johnson, the Special Master's report, and the decree of Judge Greene were all prepared with painstaking care and make more or less extended reference to the authorities, most of which are gathered from other states. Judge Greene's decree accords with the view of the law expressed by Judge Johnson, but goes more fully into the discussion of the cases. The appeal to this Court is of course based upon exceptions by the defendant to the decree of Judge Greene, but evidently in the abundance of caution there are also exceptions to the order of Judge Johnson refusing to dissolve the temporary injunction, although such an order does not determine the law of the case. *Alston v. Limehouse,* 60 S. C., 559, 39 S. E., 188. The plaintiffs by their attorneys also gave notice of certain "additional sustaining grounds." Fundamentally, however, there is but one question involved in this appeal, and that is: Did the operation of the funeral home by the defendant at the place in question and in the manner shown by the evidence constitute a private nuisance warranting injunctive or other relief?

We are fortunate in having before us three able and comprehensive dissertations on the law relating to the subject involved, to wit, the Special Master's report, Judge John-

son's order and Judge Greene's decree. And after carefully considering the same, reviewing the authorities therein mentioned, and such other authorities as we have been able to find, most of which are cited by counsel for the respective parties in their helpful briefs, and after analytical study of the testimony, it is our considered judgment that the Special Master reached the just and equitable conclusion, and we are in accord with his well-considered report in all substantial respects. In view of the importance of the issues involved we shall give in detail our reasons for this determination of the cause. And we think it is appropriate to say here that in our opinion this is a case where special weight should be given to the fact that the Special Master "saw the witnesses, heard the testimony delivered from the stand, and had the benefit of that personal observation of and contact with parties and witnesses which may be of peculiar value in arriving at a correct result"; and furthermore, that he doubtless familiarized himself with the locale, because the record shows that it was agreed by counsel that he should "go and observe the location and surroundings of the funeral home and adjacent property in question", accompanied by one attorney on each side.

Perhaps a cursory review of outstanding portions of the testimony may be of help in clarifying the subordinate issues. The funeral home in question is located on the south side of Wichman Street, and this street is a part of State Highway No. 64, a much traveled and highly important highway because constituting a link in a short route to the South. The funeral home, which was and is the residence of Mr. Parker, fronts on Wichman Street but is at the corner of that street and an unpaved side street known as Tracey Street. A glance at the map in evidence, which was admittedly approximately correct, will show that the block where the funeral home is situate and the block immediately to the east of Tracey Street, while they contain residences, could scarcely be considered exclusively residential in the usual meaning of that term, in view of the fact that there

is a Negro church and parsonage situated on each of them, besides other Negro homes, and there is a small workshop on one of them. The plaintiff, Mrs. M. M. Glover, has a home on the eastern block, but her residence is separated from the funeral home by the workshop on her premises, a Negro church and parsonage, and Tracey Street. In fact, the complaint itself alleges that the workshop "is approximately a block away" from the funeral home. However, Mr. W. C. Glover, who is a son of Mrs. M. M. Glover, and uses the small workshop, testified that the location of the funeral home depressed him, admitting, however, that funerals from the nearby Negro Church and other churches had a like effect upon him.

The plaintiff, O'H. W. Fraser, has a residence in the same block where the funeral home is situated, but separated from it by the residence of M. C. Rivers. Mr. and Mrs. Fraser testified to their objections to the location of the funeral home, and Mr. Fraser said that the "main thing was it depreciated my property". He qualified this by saying that that was his opinion; and Mrs. Fraser indicated that her objection was partly on account of their children. To the west of the Fraser home in the same block is the other Negro Church and parsonage. The occupants of the Rivers' house, which is about 20 feet from the funeral home, testified definitely that they did not object to the location and operation of the same.

North of Wichman Street there are two blocks on which certain of the plaintiffs own (or are interested in) residential property, and this area may more literally be described as residential, for the same appears to be exclusively so, except that the Episcopal Church is on the western end fronting on another street, and all of this territory is separated from the funeral home by Wichman Street; but even where zones have been created in a town, streets or highways may constitute the boundaries thereof.

Across this street on the northern side thereof, almost directly in front of the funeral home, is the residence of

Probate Judge I. A. Smoak, who testified that his residence was approximately 90 feet from the funeral home; and the "defendant" Parker testified that from his measurements it was 134 feet from his home to Mr. Smoak's. Judge and Mrs. Smoak both testified quite positively and in detail that the presence of the funeral home was exceedingly distasteful and annoying to them, in that, its presence was a constant reminder of death; perceptibly sorrowing members of bereaved families sometimes visited the home; the bodies of deceased persons were conveyed to the home, although by the. rear entrance; and it was their understanding that embalming operations were conducted therein. And they also testified that their little girl and a servant suffered like ill effects. However, Captain W. R. Ritchie, who with his wife occupied an apartment in the Smoak residence, testified just as unequivocally that he and Mrs. Ritchie were not at all disturbed by the presence of the funeral home, and that in fact it appeared to be an unusually quiet place, and that the appearance of the home was very pleasing to the eye and seemed to show the result of careful planning with reference to the grass and trees and shrubbery. Captain Ritchie also said that as he recalled it the lawn there looked better than any place on the street, that "it was a very pleasing sight."

Judge Smoak also expressed the opinion that the presence of the funeral home materially reduced the market value of his property. Testimony along the same line was given by the plaintiff H. L. Smith, whose home is also on the north side of Wichman Street, except that his objections to the funeral home were stated in a more qualified manner, and as to the matter of depreciation in value, he said in effect that he did not know about a funeral home, but he thought any mercantile establishment in that location would decrease values. There was also similar testimony from certain other witnesses for the plaintiffs; but Dr. W. H. Cone, a druggist, and experienced business man, and Honorable James E. Peurifoy, former Circuit Judge, each of whom resides on

the north side of Wichman Street near the funeral home, both testified that the presence of the home was not distasteful to them. Dr. Cone said that his family, including two children, were not adversely affected by it, and that it was his opinion that there had been no decrease in the value of his property. Judge Peurifoy, who is a man of long and varied business experience in Walterboro, stated positively that the funeral home did not disturb the comfort of himself and his family, and that he had not "seen anything that would indicate it was a nuisance." He further testified that the presence of the funeral home would not cause him to take any less for his property, and that he thought it was worth as much as it was before, but that he had not heard of any sale. There was also other like testimony for the defendant.

Without going any further into the testimony of this character, we may say that it appears to be correctly summarized by counsel for the defendant in their brief in which they say that the owners of six of the neighboring residence buildings objected to the location of the funeral home, while the owners of four thereof and the occupants of four more testified that its presence was not objectionable to them; and it may be added that with reference to the effect on children there was affirmative testimony in behalf of the defendant that some of the children in the neighborhood played with the Parker children in the yard at the Parker residence which was the funeral home. It will be remembered that the home was occupied as a residence by Mr. and Mrs. Parker and their two children.

The "defendant" D. Fred Parker testified at considerable length with regard to his operation of the funeral home. His testimony shows that by education, training and experience he was well fitted to perform the duties of an undertaker or mortician. Indeed, it was agreed by counsel for the plaintiffs for the purpose of the record "that he is a good undertaker." And at the time the testimony was taken he was the president of the South Carolina Funeral Directors

Association. He was formerly engaged in this calling in a store building on the main business street of Walterboro, and he mentions the interesting fact that there was a residence in front of it at that location and others to the rear thereof. He purchased the property on Wichman Street and resided there for some time before the removal of the funeral home, but its establishment at that place. was his intention when he bought the property, upon which he made considerable and expensive improvements in its beautification and to make it suitable for the purposes of his vocation; and in order to insure privacy he built on the premises a high crosswork lattice fence. Indeed, Mr. Parker's testimony tends clearly to support the allegations of the answer hereinbefore quoted with reference to the funeral home and its conduct and operation, and there is no substantial evidence to the contrary. (He said that he had never yet had a funeral from there, although some of the plaintiffs appear to have had a contrary impression.) He stated in effect that the use of a funeral home rather than the old time undertaking establishment is decidedly for the benefit of bereaved families because of the privacy that is thereby provided and the homelike atmosphere of the place, and that a "family would much rather know their loved ones were in the care of friends and not left alone.". Mr. Parker also said that he regarded his profession as a sacred trust. In the course of his extended examination as to other possible locations for his funeral home in Walterboro he said in substance that the whole town might be described as a residential area because even in the business section there were residences.

We are of opinion. that the testimony adduced by the plaintiffs, even if we did not consider that adduced by the defendant, is sufficient to show that the plaintiffs wholly failed to establish the allegations of their complaint that "the plaintiffs residing in said section are almost daily brought into close association with the moving and embalming of dead bodies, funerals, and the harrowing or distress-

ing incidents of death", etc.; and that the finding of fact by the Special Master hereinbefore quoted is firmly established by the evidence, as well as the following additional excerpt from his report: "The evidence fails to satisfy me that the defendant has conducted, or may conduct, his business in such a manner as to thrust upon the vision of those nearby repugnant or repulsive scenes. On the contrary the premises are so arranged that ingress and egress for all purposes may be had with no gruesome detail of the business brought to the attention of residents or passersby. It is true that friends and relatives of those whose bodies are brought to the home, may come and go through the entrance on Wichman Street, but perhaps with no greater frequency than will be the case in the conduct of funerals in the three neighboring churches. Nor am I able to find from the testimony that there is danger of the escape of disagreeable odors. If this should be the case in the future conduct of the business, relief could certainly be afforded against a condition of this nature, the right to which would be in no manner impaired by the outcome of this case."

There was some testimony given in behalf of the plaintiffs (although not within the scope of the complaint) by some physicians to the effect that under certain circumstances the handling of dead bodies might cause the spread of disease. As one of these witnesses, to wit, Dr. James C. Brabham, said, there was some potential danger if great care was not taken. But there was not the slightest evidence of lack of care on the part of the defendant, or any failure on its part to comply with prescribed rules and regulations, or that the plaintiffs were ever subjected to such a risk. The following quotation from the Special Master's report is clearly correct: "I do not think that the proof warrants the finding that danger of the spread of contagion resulting from the conduct of the business exists in such degree as to regard it as more than a remote possibility which must be looked upon simply as one of the normal commonplace hazards of everyday existence." And it should be mentioned

here that Judge Greene evidently accepted this part of the report, and because of this it is referred to in one of the "additional sustaining grounds," which for the reasons indicated we think should be overruled. In fact, it may be observed that if such danger should be held to exist with reference to a properly operated undertaking establishment, it would be true as to any location, whether in a business or residential section.

This case naturally reminds us of the progress that has been made in recent years in the undertaking business, tending to the relief and comfort of the families of deceased persons. Indeed, it has been elevated to the dignity of a profession, and many of the very disagreeable funeral customs formerly prevailing have been eliminated, and doubtless much progress will yet be made along this line. And the "funeral home" is a development of modern times looking toward dignified privacy by the creation of a homelike atmosphere as contrasted with the surroundings of everyday business. These homes are of course to be found in a great many towns and cities of the State, and sometimes, as in this case, buildings formerly used only as residences are now devoted to this purpose, frequently being improved and the surroundings beautified.

In this connection, we think the following excerpt from the testimony of Judge Peurifoy is truly significant: "In the funeral home the mortician looks after the family, keeps people out who would intrude in the sacredness of that hour and protects the family as much as possible. In the midst of life, we are in death, and it is hardly a week we do not have it before us."

Coming now to the consideration of the law governing this case, we may say that the jurisdiction of equity to enjoin a private nuisance in a proper case is, as it should be, well established. And we think that a nuisance is correctly defined in the opinion of Mr. Justice Woods in the case of *State v. Columbia Water Power Co.*, 82 S. C., 181, 63 S. E., 884, 889, 22 L. R. A. (N. S.), 435, 129 Am. St. Rep.,

876, 17 Ann. Cas., 343, as follows: "A nuisance is anything which works hurt, inconvenience, or damage; anything which essentially interferes with the enjoyment of life or property." And nuisances may be divided into two general classes, to wit, nuisances *per se* and nuisances *per accidens.* It is conceded by all parties before us that the operation of an undertaking establishment or funeral home is not a nuisance *per se,* but it is of course true that an entirely lawful business may be conducted in such an improper manner as to make it a nuisance, and there are some kinds of business which in their very nature would be nuisances in some locations.

The South Carolina "nuisance" cases cited by Judge Greene in his decree, as follows, to wit: *Frost v. Berkeley Phosphate Company,* 42 S. C., 402, 20 S. E., 280, 26 L. R. A., 693, 46 Am. St. Rep., 736; *Matheny v. Aiken,* 68 S. C., 163, 47 S. E., 56; *Henry v. Southern Ry.,* 93 S. C., 125, 75 S. E., 1018; *Peden v. Furman University,* 155 S. C., 1, 151 S. E., 907; and *Douglas v. City Council of Greenville,* 92 S. C., 374, 75 S. E., 687, 49 L. R. A. (N. S.), 958, were soundly and correctly decided, but do not throw much light on the instant case. There is, however, a more recent decision which, while not precisely in point, furnishes a useful side light. We refer to the case of *Fincher v. City of Union,* 186 S. C., 232, 196 S. E., 1, 4, in which the opinion was delivered by Mr. Justice Baker. This case involved a municipal ordinance prohibiting the operation of a barbecue stand located in any residential area of the city during certain hours, residential area being defined as a section of the city where two or more houses used for residential purposes are located on abutting property. The Court held that such an ordinance was unconstitutional because of its arbitrary and capricious definition of a residential area, thus unduly restricting the operation of a lawful business, which might indeed become a nuisance if not operated in a decent, respectable, quiet and peaceable manner, but was not a nuisance in itself. The Court uses this significant lan-

guage: "Economic and social progress and changes reflect themselves in the interpretation of the' law. These various forces are inescapably interlinked. The present case is an illustration of a situation brought about by entirely new conditions. But it is fully covered by fundamental constitutional principles that only need interpretation in the light of today's facts."

So far as our research shows, and that of counsel, no funeral home case has ever come to this Court, except that of *Momeier v. John McAlister, Inc.,* in which there have been two appeals, but none upon the merits. The two opinions in this case are reported in 190 S. C., 529, 3 S. E. (2d), 606, and 193 S. C., 422, 8 S. E. (2d), 737, 129 A. L. R., 880. Aside from the fact that this case has not been heard by this Court on the merits, it may be observed that it involves the alleged violation of a city zoning ordinance, thus distinguishing it from the present case.

The second decision of this Court in the case is, however, of interest here, because the Court therein clearly indicated that the rule applied in *Kennerty v. Etiwan Phosphate Co.,* 17 S. C., 411, 43 Am. Rep., 607, to the effect that before equity will enjoin a private nuisance it must first be determined by a jury trial at law that such a nuisance exists, does not conform to the modern practice which will permit the issuance of an injunction without any such determination on the law side of the Court. But such a holding does not tend to relax judicial strictness with regard to the drastic remedy of injunction, especially as applied to the operation of a business or calling which is not a nuisance *per se.* In considering whether a funeral home should be declared a private nuisance, we must have due regard to the reciprocal and important rights of the parties, to wit, the right of the defendant to operate on its own property a business which is not only lawful but indispensable, provided it does so in the proper manner; and also the right of the plaintiffs to be protected in the reasonable enjoyment of their prop-

erty. Nor should we forget the interests of the public who are served by the defendant in the exercise of its vocation.

The record contains a good many allusions to the fact that the Town of Walterboro granted to the defendant a license for the operation of its funeral home at the place in question, and as to this we may say that while it is by no means conclusive, and certainly could not oust the Court of its jurisdiction, it is a circumstance in favor of defendant to be given due weight. But without regard to that, we are persuaded that practically the same rule should apply in reference to injunctions against a private nuisance as that indicated with reference to a public nuisance. In the case of *Morison v. Rawlinson, Chief of Police,* 193 S. C., 25, 7 S. E. (2d), 635, 640, opinion by Mr. Justice Fishburne, it is said that since the remedy of enjoining a public nuisance is so severe, "resulting often in wholly depriving an owner of the use of his property, the Court will proceed with the utmost caution."

Viewing the issues before us in the light of our own decisions, without reference to those of other jurisdictions, we are convinced that the Special Master reached the right conclusion when he said, referring to the operation by the defendant of its funeral home: "The question of whether or not the operation of such a business so located could be designated a nuisance as legally defined, would involve the existence of some element or elements other than that of location, such as unsanitary methods menacing health and comfort, depressing surroundings, objectionable odors, scenes and conduct of grief and distress forced upon the vision and sensibilities of neighboring citizens or property owners, or other similar tangible evidences of death and its grievous and unhappy attendant incidentals. It is not sufficient that there are those living nearby whose feelings and humors are unhappily affected by the mere abstract knowledge of the existence of a place where dead bodies are prepared for burial, or where funeral rites are conducted. It is not sufficient that the minds of some persons in the vicinity should

be depressed by fear of the spread of disease unless there should be actual and reasonable foundation for such fear."

It is a sound and equitable principle that the discomforts arising from an alleged nuisance "must be physical, not such as depend upon taste or imagination" of the persons claiming to be adversely affected, especially when others in practically the same situation do not experience such mental "reactions".

We believe the views just expressed are supported by well-reasoned opinions from other states, although there is a good deal of highly respectable authority *contra*. Judge Johnson and Judge Greene both concluded that they were following the majority view as expressed in cases from other jurisdictions, and there are indeed statements in the books which would lead to this inference; yet it may be of significance to observe that the following statement of the law as contained in that usually accurate work, Corpus Juris, especially the portion of the quotation we have underscored, indicates that the majority view might perhaps be just the other way: "An undertaking establishment or a funeral parlor is not a nuisance *per se,* but by reason of surrounding circumstances it may become a nuisance. It may constitute a nuisance by reason of its location, as, for instance, under particular circumstances, when it is located in a residential district, notwithstanding, it has been held, it does not directly affect the health or grossly offend the physical sense; *but it has been more frequently held that the mere location in a residential district is not sufficent to make such an establishment a nuisance."* 46 C. J., 726. (Emphasis added.)

Cited in the footnote to the italicized portion of the foregoing excerpt are the following interesting and important cases: *Dean v. Powell Undertaking Company,* 55 Cal. App., 545, 203 P., 1015; *Pearson & Son v. Bonnie,* 209 Ky., 307, 272 S. W., 375, 43 A. L. R., 1166; *Westcott v. Middleton,* 43 N. J. Eq., 478, 11 A., 490, affirmed without opinion, 44 N. J. Eq., 297, 18 A., 80.

After rather intensive study of the various decisions, we find it somewhat difficult to divide them into two distinct classes, in view of the many and varying differentiating facts and circumstances; some of the cases, for example, holding that the operation of a funeral home in a certain locality constituted a nuisance because *inter alia* there was evidence of noxious odors arising from the premises. In other cases there was a statute or ordinance relating to the matter; in some there was the alleged operation of a more or less public morgue where bodies were constantly kept for long periods of time; and in some cases there was a congested city residential area involved. Indeed, considerable space is taken up in many of the opinions pointing out such distinguishing details. And it may be worthy of note that one of the cases cited both in the order of Judge Johnson and in the decree of Judge Greene as strongly supporting their conclusions is that of *Saier v. Joy,* 198 Mich., 295, 164 N. W., 507, L. R. A., 1918-A, 825; but this decision was distinguished in a later Michigan case, *Dutt v. Fales,* 250 Mich., 579, 230 N. W., 948, on the ground that in the *Saier case* the plaintiff's property was only 13½ feet from that of defendant and the Court thought that noxious odors might escape.

But while it is difficult to classify the numerous cases into two definite categories, it is quite true that the authorities are divided upon the specific point involved here, and there are decisions to the effect that in a case where there is no tangible invasion of the neighboring property, no odor, noise or contagion, nothing save that the funeral home reminds of death, if the area involved is exclusively residential neighboring property, a funeral home will be enjoined as a nuisance. On the other hand, other Courts have held, basing their opinion upon established principles of equity, that the invasion must be actual and physical, and that a mere sentimental distaste in the minds of nearby property owners is not sufficient.

Regardless of where the numerical weight may lie, we believe the latter cases are based upon sounder reasoning. Surely the fact that some persons may be displeased and annoyed because of the reminder of death, perhaps due to sensitive imaginations, is not enough to warrant the process of injunction to prevent the proper operation of a lawful business in a place well suited for its conduct. In fact, we shall from time to time be reminded of the inevitable and inexorable fact of death no matter where funeral homes may be located. If the funeral home were surrounded by mercantile establishments or removed beyond the ordinary haunts of men, this would not eliminate from our minds those occasional "darker musings when thoughts of the last bitter hour come like a blight over .the spirit." But the exigencies of practical living, to say nothing of the precepts of religion, require us to adjust ourselves to this condition, remembering that death is one of the processes of nature, as natural indeed as birth.

We do not wish to prolong this opinion unduly by the citation of authority. Most of the cases on the subject will be found in the valuable annotations in 23 A. L. R., 745, 43 A. L. R., 1171, and 87 A. L. R., 1061. The Kentucky Court in the leading case of *Pearson & Son v. Bonnie,* 209 Ky., 307, 272 S. W., 375, 43 A. L. R., 1166, *supra,* examines and discusses many of the cases in point, and holds in accordance with the views we have hereinbefore indicated that an injunction will not lie against the establishment of an undertaking business in the residential portion of a city, where the only injury is depreciation in the value of neighboring property and the injury to the feelings of its occupants because of sentimental repugnance to such business.

In the case at bar, as we have already shown, there was some testimony pro and con as to depreciation in value of the property in the vicinity of the funeral home by reason of its location, but all of this evidence consisted of mere expressions of individual opinion, not based upon any sales or attempted sales whatever. Hence it is a matter of specu-

lation as to whether any such depreciation has resulted or would result. But even if we should assume that the preponderance of the evidence shows such depreciation, this certainly would not be sufficient in itself to warrant the injunction. This is the holding in the *Pearson case,* and there are other authorities to the same effect. The true rule on this subject seems to be well stated in the California case of *Dean v. Powell Undertaking Company,* 55 Cal. App., 545, 203 P., 1015, 1018, *supra,* as follows: "The trial court found that the value of the plaintiffs' property for residential purposes will be depreciated. Such findings, standing alone, and not supported by other findings showing that the defendant is maintaining, or is about to maintain, a nuisance, will not support the judgment. In many instances in populous neighborhoods the property of one person is depreciated by the near proximity of the property of another. Such burdens are ordinary incidents to residence and ownership in a city. * * *"

In the opinion of the New Jersey Court in the oft-cited case of *Westcott v. Middleton,* 43 N. J. Eq., 478, 11 A., 490, 492, affirmed without opinion, 44 N. J. Eq., 297, 18 A., 80, *supra,* there is laid down the principles which we think are controlling here, for while there were some additional factors in that case its holdings are clearly in point on the vital issue. We quote the following from the opinion:

" * * * Must the undertaker retire from the inhabited parts of our villages, towns, and cities? Is an occupation which is absolutely essential to the welfare of society to be condemned by the courts, to be classified with nuisances, and to be expelled from localities where all other innocent and innoxious trades may be carried on? In other words, is this business so detestable in itself as unreasonably to interfere with the civil rights or property rights of those who dwell within ordinary limits, and who can and do, without effort, see and hear what is being done? The inquiry is not whether it is obnoxious to this or that individual or

not; but whether or not it is of such a character as to be obnoxious to mankind generally, similarly situated. There are certain obscene or offensive sights, certain poisonous or destructive gases or odors, certain disturbing sounds or noises, which affect most persons alike; can the business of an undertaker be classed with any of these? Is the business of an undertaker of this class? Before the court can condemn a trade or calling, it must appear that it cannot be carried on without working injury or hurt to another; and, as I have said, that injury or hurt must be such as would affect all reasonable persons alike similarly situated. *The law does not contemplate rules for the protection of every individual wish or desire or taste. It is not within the judicial scheme to make things pleasant or agreeable for all the citizens of the state.* (Emphasis added.)

\* \* \* \* \*

"In this case, then, we have the broad, yet perfectly perceptible or tangible, ground or principle announced, that the injury must be *physical,* as distinguished from purely *imaginative.* It must be something that produces real discomfort or annoyance through the medium of the senses; not from delicacy of taste or a refined fancy. This is very comprehensive; indeed, I cannot conceive of a more liberal or broad statement of the law; yet I apprehend it is a true delineation of the law. \* \* \*"

It will be borne in mind that we are not dealing with a case where a zoning ordinance has been adopted and put into effect, or with any statute relating in any wise to the location of a funeral home or undertaking establishment, although in the year 1924, the General Assembly did adopt an Act authorizing cities and villages to pass zoning ordinances, prescribing in detail the contents thereof. This Act is embodied in Sections 7390-7398, both inclusive, Code 1932. But of course we do not presume to suggest any legislative policy, nor do we attempt to prescribe a formula which will apply to all cases; on the contrary, we confine our decision to the facts and circumstances of the case at

bar. For we are in substantial agreement with the quite recent Louisiana case of *Moss v. Burke & Trotti,* 198 La., 76, 3 So. (2d), 281, 283, decided in 1941, which holds in effect that the law as announced by the Kentucky Court in the *Pearson case, supra,* is fundamentally correct; and that whether a funeral home and embalming business will be permitted in a particular district depends .on the application of the "rule of reason." After referring to the conflict of interests, the Court said: " 'Doubtless it would be difficult, if not impossible, to state a rule by which this conflict between the interests of the individual home owner and the community necessity of care for the dead may be wholly harmonized. The nearest approach is to say that the rule of reason should prevail; which means that each case must depend upon its own peculiar circumstances as to whether the use of certain property in a certain locality for the business of undertaking and embalming is reasonable or unreasonable.' "

The decree of the Circuit Court should be reversed, the injunction thereby granted dissolved, and the complaint dismissed with costs.

N. B. The foregoing opinion was written as and for the opinion of the Court, but a majority of the members not having concurred therein, it became a dissenting opinion in which Justice Baker joins.

Mr. Associate Justice Baker (dissenting and concurring) :

I dissent from the majority opinion and concur in the opinion of Acting Associate Justice Lide. The cause has been argued before this Court twice. Following the original argument I wrote an opinion in which I expressed views and conclusions similar to those set forth in the opinion of Judge Lide. At the suggestion of the Chief Justice that opinion has been filed, but the same need not be reported. Judge Lide has in his opinion ably presented the controlling factors in the case. To what he has said I would merely add an expression of my profound conviction that this

Court by its majority ruling has impinged upon a fundamental right of property, and has undertaken to do what the legislative authorities of the municipality in question have with obvious deliberation refrained from doing.

Indeed, where, as here, the evidence is undisputed that the home is operated and maintained with the utmost regard for the sensibilities of neighbors, and without any suggestion of discomfort or danger to neighbors or others by reason of odors, disease or other physical factors, it might be questioned whether the municipality could even by ordinance impose the restriction or limitation which the Court is imposing, due regard being had to the undisputed testimony as to the surroundings of the property in question in this case.

There being however no legislative mandate to control the Court, our decision must stand as a declaration of the common law. The sources of such law must be found in the customs of our people, and in their social and business standards as affected by common-law principles established in related situations. Whatever may be the situation in certain other states, the people of the small communities in South Carolina have long displayed their recognition and acceptance of the conclusions stated in Judge Lide's opinion.