15575

MOMEIER v. JOHN McALISTER, INC.

(27 S. E. (2d), 504)

(See also: 190 S. C., 529, 3 S. E. (2d), 606, and 193 S. C., 422, 8 S. E. (2d), 737)

October-ber, 1941.

356

358

*Mr. H. L. Erckmann* and *Mr. John I. Cosgrove,* both of Charleston, S. C., Counsel for Appellant, 

*Mr. Augustine T. Smythe,* of Charleston, S. C., Counsel for Respondent,

September 3, 1943.

Mr. Associate Justice Stukes delivered the majority Opinion of the Court, with Circuit Judge J. Henry Johnson, Acting Associate Justice, filing a Concurring Opinion and Mr. Associate Justice Baker filing a Dissenting Opinion. The Opinion of Mr. Associate Justice Stukes follows:

I most respectfully disagree with the opinion of Mr. Justice Baker, and I think that the decree of the Circuit Court should be affirmed for the sound reasons and conclusions it contains. It will be reported.

In the first place, the decision of the case at bar should not be affected in any important particular, if at all, by *Fraser v. Fred Parker Funeral Home,* 201 S. C., 88, 21 S. E. (2d), 577, or affect it. A zoning ordinance was not involved in the *Fraser case*; the municipality concerned had none. Mr. Justice Baker expressly recognized this vital difference in the cases at the outset of his opinion, but proceeded to disregard it and to reiterate the minority view in the *Fraser case*.

In the second place, the law governing this case was largely settled in the last appeal of it, *Momeier v. John McAlister,* 193 S. C., 422, 8 S. E. (2d), 737, 739, 129 A. L. R., 880, when it was held by this Court without dissent that the plaintiff need not prove a common-law nuisance (as was necessary in *Fraser v. Fred Parker Funeral Home, supra*) and that, quoting, "the violation of a valid zoning ordinance gives rise to one who has been, or will be, specially damaged by such violation, a cause of action in equity for an injunction against such violation * * *." Numerous cases from other jurisdictions were cited in support of the decision and others will be found in the annotation following report of it in 129 A. L. R., 880, and in the earlier annotation there mentioned, 54 A. L. R., 366.

The editor of the former accurately summarized our unanimous holding at page 886 of 129 A. L. R., as follows : "Thus in *Momeier v. John McAlister* [193 S. C., 422, 8 S. E. (2d), 737, 129 A. L. R.], 880, the Court has adopted the view that apart from any consideration as to whether a private nuisance existed, the mere violation of a valid zoning ordinance gives rise to a cause of action in equity for an injunction against such violation, at the instance of a property owner who has been or will be specially damaged, and that the trial of the issues is to proceed without a jury, as that of an ordinary suit in equity."

The foregoing is, from examination of the authorities, undoubtedly the very decided majority rule.

It is apparent from the opinion of Mr. Justice Baker that he has confused the applicable rule, set out above, with cases in which zoning ordinances were not involved and they (those cases) were concerned with whether or not the funeral home, whose location was under attack, had been proven a nuisance, which is clearly a question not now presented. The A. L. R. annotations cited by him in Volumes 23, 43 and 87 all relate to the problem of whether a funeral home in a residential section is a nuisance, and not to the validity and enforcement of a zoning ordinance, our present problem. And the rather old (in view of the recent increasing wealth of authority on the subject) California case which he cites in conclusion of his discussion of what he regards as the applicable law, *Dean v. Powell Undertaking Co.,* 1921, 55 Cal. App., 545, 203 P., 1015, was not decided under a zoning ordinance and the Court expressly said so, implying a different result if there had been such an ordinance.

Surely it, and the language of it, are not pertinent here. Later California cases in agreement with the views herein expressed are cited in 129 A. L. R., 885, and the holdings of some of them summarized on pages 886 and 887.

After the decision of the last appeal of this case, cited above, there were left for determination the issues of the

existence .of the zoning ordinance and whether defendants had violated it; its constitutionality; and whether plaintiff was specially damaged by such violation, if found, that is, whether he suffered injury not common to the general public.

Taking these issues in the order just stated, there is no doubt of the existence of the ordinance enacted in 1931 pursuant to the enabling statute of the State. And I think that likewise nothing need be added to the conclusion of the trial Judge that defendants' operations at 150 Wentworth Street, whether it be called a funeral home or semi-funeral home, constitute a plain violation of the ordinance. It is not permitted there.

Such former doubts as were entertained concerning the constitutionality of zoning restrictions were set at rest by the decision of *Euclid, Ohio, v. Ambler Realty Co.*, 272 U. S., 365, 47 S. Ct., 114, 71 L. Ed., 303, 54 A. L. R., 1016. Annotations following report of it and supplementary are found in 54 A. L. R., 130 (with references to three prior annotations), 86 A. L. R., 659, and 117 A. L. R., 1117. This opinion need not be prolonged by reviewing the reasons moving the Courts to uphold such regulations, necessitated by the complex conditions encountered in our present-day cities.

But appellants contend that the ordinance here involved contains an invalid delegation of legislative power to a Board of Adjustment who may upon appeal and hearing in effect waive compliance with the ordinance, etc., which renders it unconstitutional. Controlling analogous cases from this Court to the contrary were cited by the lower Court. To them may be added the authorities found in 86 A. L. R., 675 and 693, which relate particularly to such provisions in zoning statutes and ordinances.

No discrimination is found in the ordinance rendering it invalid. Permission for the continuance of nonconforming uses existing at the time of passage of

the regulations is common in such enactments. It would seem almost, if not quite, necessary. 86 A. L. R., 678. The record indicates that the establishments other than residences in the neighborhood come within such provision and their existence is, therefore, of no importance in the controversy. But if there should be other violations, they would not justify appellants' failure to comply.

I have a very different view of the testimony, which I have carefully read more than once, relating to the factual issues, from that expressed by Mr. Justice Baker when he says that appellants' testimony at least balanced that of the respondent. I fully concur in the findings of fact of the Circuit Judge; in fact I have no doubt that the preponderance of the evidence was with the respondent and that in addition to the interruptions suffered by him and the members of his family in the usual enjoyment of their home, due to the business activities of the appellants next door, there has been a material impairment in the money value of respondent's property for residential purposes, and there is no testimony that it is of any value for any other purpose. And this depreciation in value is enough alone to constitute respondent a "specially damaged plaintiff."

A great many real estate brokers testified to substantial impairment of value of a residence closely adjacent to a funeral home. These were expert witnesses, qualified by their occupation and experience, whose evidence cannot properly be classified as "speculative and imaginary." Such witnesses, in addition to those from Charleston, were in the real estate business in Florence, Orangeburg, Columbia, Anderson, Spartanburg and Greenville. Other witnesses, in other business and professions, testified to the same effect. There was conflicting testimony along this line by witnesses for the appellants but, as stated, I think their testimony was far outweighed by that of the respondent and his many witnesses. The great majority of the dealers in real estate who testified were in agreement that the value was impaired,

and practically all the witnesses were of the opinion that many people would not buy a home next door to a funeral home.

That respondent is not desirous of selling his home ■ which he has occupied as such for over thirty years is of little or no probative value. He need not, if the law as I see it is enforced. And there is not even a hint in the testimony that he could sell his long-established home for anything near the amount which he has invested in its cost and subsequent improvement over the years.

It is worth recording again that this case does not involve the declaration of appellants' funeral home to be a nuisance. It involves merely the enforcement of a valid zoning restriction against business establishments generally in the residential section in question. Appellants might have erected a gasoline filling station on their corner and have been subject to the same litigation and injunction, granting that such business is prohibited there and a "specially damaged" plaintiff brought suit. Thus, this case is not a "funeral home" case as the term is ordinarily used.

Another consideration which seems to have influ- ■ enced Mr. Justice Baker and possibly should be answered is that the municipal authorities have apparently done nothing about the violation of the zoning ordinance in this case, but the latter is understandable and should be of no importance in the controversy. If their inaction were conclusive in such cases there would be no room for Courts of equity to act, yet there have been many successful suits such as this. See the several annotations cited. Every action for the abatement of a public nuisance might be met with the same contention, if valid, that the public authorities have not acted, which illustrates the impotence of the argument.

The questions presented by the exceptions have all been carefully considered and found without merit, and the latter should be overruled.

The foregoing, having been concurred in by a majority, has become the judgment of the Court.

The judgment appealed from is affirmed.

MR. ASSOCIATE JUSTICE FISHBURNE and CIRCUIT JUDGE J. HENRY JOHNSON, ACTING ASSOCIATE JUSTICE, concur.

CIRCUIT JUDGE J. HENRY JOHNSON, ACTING ASSOCIATE JUSTICE (concurring):

I am in complete agreement with the opinion of Mr. Justice Stukes herein, as far as it goes, but I wish to emphasize the fact that an almost unanimous line of authority in the United States, including the Federal Courts, holds that an owner of residential property is entitled to injunctive relief against the violation of a zoning ordinance when it appears that special damage, by way of diminution in value of his property, has been or will be suffered by him as a result of the violation of such ordinance. 129 A. L. R. (Annotation), 885.

That rule having been adopted by this Court by unanimous opinion, upon the second appeal herein, 193 S. C., 422, 8 S. E. (2d), 737, 129 A. L. R., 880, and being the law of the case, it occurs to me that the only issue of merit in the present appeal is whether or not the evidence shows that plaintiff, an adjoining property owner occupying his premises for residential purposes, has been, or will be, specially damaged by way of depreciation in value of his property as a result of defendants' deliberate violation of the zoning ordinance of the City of Charleston, adopted in 1931 pursuant to the authority of an enabling statute of the General Assembly.

In the aggregate the witnesses on each side were approximately the same, but, of twenty-five real estate agents from the cities of Charleston, Columbia, Greenville, Spartanburg, Florence, Anderson and Orangeburg, approximately twenty of them, including one offered by defendants, gave it as their opinion that the location and maintenance of a funeral home

or undertaking business in a residential area causes a depreciation in value of the adjoining property, some basing their testimony allegedly upon their experience, and one of these citing sales figures of the identical properties before and after the establishment of a funeral home in the neighborhood, some basing it upon their observation, and some predicating it upon their knowledge of those elements that adversely affect the desirability and value of residential property. While I regard the testimony of many of these witnesses as being direct and positive in character, yet, if it be considered as opinion evidence only, surely, in matters affecting the value of real property, experienced real estate agents may properly be regarded as experts; certainly they are more apt to be better informed than the average layman, or lawyer, or jurist, about those things that substantially impair the value of residential property, and their evidence, in the absence of any showing of bias, prejudice, or corruption, should be accorded the highest probative value. Unquestionably, as I review the evidence in the case, the overwhelming weight thereof establishes the fact, as found by the learned Circuit Judge, that maintenance of a funeral home in a residential district causes depreciation in value of the adjoining property.

It may not be amiss to add that the correctness of the opinions of the great majority of the real estate agents testifying at the trial finds strong support in the historical fact that all over this nation in recent years legislative bodies of the several states have enacted statutes permitting the zoning of municipalities into residential and commercial districts, and many of the larger cities have not hesitated to take advantage of such enabling acts. As all legislative bodies, whether of commonwealths or municipalities, are sensitive to majority public opinion, it would seem that such action by State Legislatures and by City Councils confirms the conviction of the writer that large numbers of normal citizens in many States are convinced that the maintenance

of business enterprises, of whatever nature they may be, whether funeral homes or foundries, grocery stores or cafes, industrial plants or mercantile establishments, should be in districts·removed from those occupied by the home-owners of the nation. Speaking for myself alone, as I am throughout this opinion, which has not been submitted to my brethren for their concurrence, I am not prepared to concede that the rights of those engaged in business are paramount to the rights of owners of long-established residences, regardless of the humbleness of their station in life, or that the latter, in order to enjoy that peace, quiet, comfort and repose that homes are made for, must abandon their inheritances to the onward march of industry and move to the suburbs of municipalities. Surely the rights of home owners, which the legislative branch of this commonwealth has sought to protect against the intrusion of commercial enterprises, should be preserved inviolate by the judicial branch thereof when, in defiance of legislative edict and municipal fiat, residential areas of our cities and towns are invaded by business interests.

For myself, therefore, I am confirmed in the opinion that, in actions arising under zoning ordinances, this Court should adopt the rule that, when a district zoned for residences is invaded by a proscribed business enterprise in violation of a valid zoning ordinance, it will assume, or take cognizance of the fact, or at least presume, that such violation will cause special damage by way of diminution in value of an adjoining home owner's property, and will enjoin such unlawful intrusion at the instance of the aggrieved property holder.

And while, as pointed out in the opinion of Mr. Justice Stukes, we are not here concerned with the question of whether the maintenance of a funeral home in a strictly residential area may be enjoined as a nuisance, in the absence of a zoning ordinance, as was the issue in *Fraser's case,* 201 S. C., 88, 21 S. E. (2d), 577, I cannot refrain from taking advantage of the opportunity to state, most deferentially, and

again for myself only, that, in my opinion, the proper rule to apply in such cases is that which seems to me to be supported by a majority of the modern, or more recent, decisions of the Courts of last resort of the several states, as well as by eminent textwriters, commentators and annotators, viz.: (1) An undertaking establishment is not a nuisance *per se*. The business of preparing our sacred dead for decent interment is not only lawful, but it is an indispensable and holy duty. (2) It may become a nuisance, however (a) from the manner in which it is conducted, or (b) because of the place at which it is maintained; "and it is very generally held to be such when it intrudes itself into a strictly residential district." *Tureman v. Ketterlin,* 304 Mo., 221, 263 S. W., 202, 204, 43 A. L. R., 11, and cases there cited; Cooley on Torts, 4th Ed. (1932), Vol. 3, p. 180, where it is said: "By what appears to be the weight of modern authority, however, it is held that the location of such a business in a residential district is sufficiently objectionable to make it a nuisance;" 87 A. L. R., 1062, where the commentator states: "The greater weight of recent authorities is to the effect that the establishment and operation of an undertaking business in a purely residential section under circumstances which would cause a depressing feeling to the families in the immediate neighborhood and a constant reminder of death appreciably impairing their happiness or weakening their powers to resist disease, and depreciating the value of their property, constitutes a nuisance;" A. L. R.'s Digest of decisions subsequent to the annotation in Volume 87 of that publication; *Kundinger et al. v. Bagnasco et al.,* 1941, 298 Mich., 15, 298 N. W., 386, *et seq.*; and cases cited in the concurring opinion cf Acting Associate Justice Oxner in *Fraser's case, supra.*

Surely, in view of the modern medical theory concerning the art of healing, "it requires no deep research in psychology to reach the conclusion that a constant reminder of death has a depressing influence upon the normal person. Cheerful

surroundings are conducive to recovery for one suffering from disease, and cheerful surroundings are conducive to the maintenance of vigorous health in the normal person. Mental depression, horror, and dread lower the vitality, rendering one more susceptible to disease, and reduce the power of resistance. * * * all of these are conducive to depression of the normal person; each of these is a constant reminder of mortality. These constant reminders, this depression of mind, deprive the home of that comfort and repose to which its owner is entitled." *Saier v. Joy,* 198 Mich., 295 299, 164 N. W., 507, 508, L. R. A., 1918-A, 825.

The judgment below should be affirmed.

MR. ASSOCIATE JUSTICE BAKER (dissenting).

The respondent, plaintiff below, instituted this action against appellants, defendants below to obtain injunctive relief against the continued maintenance and operation of a semi-funeral home at the northwest corner of Wentworth and Smith Streets in the City of Charleston, adjoining the property of respondent on Smith Street.

Following the settlement of questions of procedure by this Court (see 190 S. C., 529, 3 S. E. (2d), 606; and 193 S. C., 422, 8 S. E. (2d), 737, 129 A. L. R., 880), the cause was referred to the Master of Charleston County for the purpose of taking and reporting the testimony.

The case finally came on to be heard before Honorable E. H. Henderson, presiding Judge, who in a decree dated January 2, 1943, granted the permanent injunction prayed for in the complaint. The appeal herein is from this decree.

At the outset, attention is directed to the fact that this is not a case for the enjoining of a private nuisance as was *Fraser et al. v. Fred Parker Funeral Home,* 201 S. C., 88, 21 S. E. (2d), 577, but is an action to enjoin the violation of a zoning ordinance. To entitle an adjoining property holder to the drastic remedy of injunctive relief against the violation of a zoning ordinance, conceding the validity of such ordinance, and that it is apposite, the adjoining property

holder must show special damage not suffered by the general public. See *Momeier v. John McAlister,* 193 S. C., 422, 8 S. E. (2d), 737, 129 A. L. R., 880.

Before entering upon a discussion of the facts of this case, it is not amiss to reiterate that each case of this nature must be decided on its own merits, and on its own particular facts. *Fraser et al. v. Fred Parker Funeral Home, supra.*

In the interest of brevity, we will treat the "funeral home" property as that of all of the appellants.

By deed dated May 14, 1937, the appellants acquired a lot of land with the improvements thereon at the northwest corner of Wentworth and Smith Streets in the City of Charleston, South Carolina, measuring on Wentworth Street approximately 212 feet, and on Smith Street approximately 195 feet. The large residence situate thereon, which is well back from both of said streets, is occupied by one of the appellants, James A. McAlister, as a home for himself and his family, and as needed, also for a semi-funeral home in connection with the undertaking business of another of the appellants, John McAlister, Inc., conducted in the main at 169 Meeting Street, a crowded business district, at which last-named location bodies are prepared for burial, and in the majority of such instances then transferred to the Wentworth Street property there to await funeral services and interment. The residence and out buildings are shaded by a substantial grove of trees and shrubbery.

The respondent owns the adjoining lot to the north of the property of appellants, his outlet therefrom being on Smith Street. The residence situate thereon is occupied by the respondent and his family, and is of typical Charleston architectural design, being three stories in height, and the porches thereto, one for each story, being to the side of the home adjacent to the McAlister property. The north wall of the main building of the McAlister residence and funeral home is approximately forty feet from the home of respondent, and on the dividing line between the properties there

is a brick wall approximately six feet in height, which obscures all view of the McAlister premises from the ground floor porch of the respondent's home.

Vehicles enter the McAlister property through an entrance on Smith Street and follow a circular driveway behind and to the north of the main building, turning towards the south on the west side of the premises on a driveway which leads into Wentworth Street. These vehicles can be seen from respondent's residence for only a short distance after entering the McAlister property, and when the vehicles pass the servants' quarters beside the brick wall above referred to, they cannot be further seen by anyone on the upper stories of the respondent's residence. Remains of deceased persons are handled in and out of a doorway of the funeral home where it is impossible for respondent and the members of his family to see this operation from their home.

The properties involved are not located in a strictly residential section of the City. On the northeast corner of Smith and Wentworth Streets there is situate the American Red Cross Headquarters. Immediately to the north is an apartment house which is directly across Smith Street from respondent's residence, and the next lot going north has an apartment house thereon. On the southeast corner of Wentworth and Smith Streets, there is located the office building of Atlantic Coast Life Insurance Company, and on the southwest corner of said streets there is an apartment building. On Wentworth Street within the same block as is the appellants' property, there is a grocery store, an apartment house and an office. On the south side of Wentworth, opposite the same block, is a grocery store and a physician's office. On first block east of appellants' property, on the south side of Wentworth Street in addition to the office building at the southeast corner of Smith and Wentworth Streets hereinbefore referred to, there is an old stable, a drugstore, a Negro residence, a duplex apartment house and an apartment house and beauty shop.

The City of Charleston in adopting a zoning ordinance recognized that this section of the City was not strictly residential.

We think that the foregoing brief description and locale of the respective properties of respondent and appellants is sufficient for the purposes of this opinion.

Shortly after the acquisition of the property at the corner of Wentworth and Smith Streets by the appellants, in addition to James A. McAlister and his family occupying it for a home, the appellants commenced to use it as a semi-funeral home, that is, being engaged in the business or profession of undertakers and embalmers (morticians), after bodies are prepared for burial at their establishment on Meeting Street, the bodies are, in a majority of such occasions, transferred to the Wentworth Street premises, where they remain until the time fixed for the last sad rites; and funeral services are conducted at the Wentworth Street property. (We think it is a safe assumption that it was and is the intention of appellants to convert this property to the use of a complete funeral home.)

Respondent's complaint, after alleging the ownership by appellants of the premises at the northwest corner of Wentworth and Smith Streets, consisting of a dwelling house, outbuildings, and garden and lawn, which were erected for and have always been used as a private residence, further alleged that said premises are situated within a "B" Residence District, as defined in the Zoning Ordinance of the City of Charleston, and that the use of the property for the general purposes of a funeral home, to which use the property was then being put with such frequency as to constitute a course of business, was forbidden by the said Zoning Ordinance; that such use of the property is and will be injurious to the respondent and to his property adjoining in that the conduct of such a business next door to respondent's home will interfere with the enjoyment by the respondent of his home, will be injurious to his health, and that of his family, and

will impair the value of his property, which is valuable and saleable primarily as a residence; that respondent will suffer special and irreparable damage if appellants are permitted to use their property adjoining that of respondent for and as a funeral home; that the city officials of Charleston had in effect refused to take any action thereabout, notwithstanding its Zoning Ordinance.

The answer of appellants admitted the ownership of the property, and that on occasions mortal remains of persons have been taken to the said premises pending their interment, and that funerals have been conducted over the mortal remains of some of them, and that some of them have been taken from the said premises to churches for funeral services. Further answering, they denied that it was unlawful to maintain a "funeral home" at the premises if properly conducted, and denied that respondent had suffered or will suffer any damages special or otherwise by reason of their alleged use of the property. There is also a denial that the Zoning Ordinance forbids the use of the property for the purpose of a funeral home, but alleges that if it does, then such Ordinance is to that extent arbitrary and unreasonable, and in violation of named articles and sections of the Constitution of South Carolina; and of the Fourteenth Amendment of the Constitution of the United States.

The foregoing is a brief summary of the contents of the complaint and answer, but sufficient for an understanding of the issues herein to be decided.

Conceding the validity and appositeness of the Zoning Ordinance. the gravamen of the action is that special damage is shown by: (1) The proximity of a funeral home to respondent's place of residence injuriously affects the value and salability thereof; and (2) the depressing effect of residing in such close proximity to a funeral home.

It is to be observed that there is no charge in the complaint that there is anything about the manner in which the appellants' business is conducted that causes injury, or that

the conduct of the business involves any public risk, or risk to the respondent, of contagion from infectious diseases, or that the comfort and enjoyment of his home are impaired or disturbed by noxious odors, unnecessary exposures, or any other character of physical conditions that are repulsive to the senses. The complaint is definitely restricted to the physical discomforts that result from the mental reactions of being subjected to close association with the moving of dead bodies and funerals, and the distressing incidents of death. The alleged physical discomforts, that is, the disturbance of the peace and comfort of respondent's home, and the depreciation in value of his property have relation to the normal conduct of the appellant's business without any suggestion of criticism either of the business, or of the proprieties enveloped in its operation.

There are, in addition to respondent, two owners of property immediately adjoining the property of appellants, who reside thereat. One of these, a Mrs. Ratcliffe (154 Wentworth Street), who has a perfect view of appellants' premises in that eight windows to her home and her porch affords a view, and she can observe and has observed the activities going on at the premises of the funeral home, has no objection to such activities, is in nowise depressed or made nervous thereby, and does not consider that the maintenance of the funeral home there has impaired the value of her property. The other adjoining property owner, a Mr. McGee (80 Rutledge Avenue), whose backyard abuts and adjoins the property of appellants, is depressed and believes that his property has been impaired in value by the maintenance of the funeral home. The only other close resident to testify in the case, other than the respondent and the members of his family, was a Mrs. Jenkins, residing at 48-b Smith Street, opposite the premises of the respondent and the appellants who testified that the activities at the funeral home and premises would not affect one's health; nor make one depressed or nervous; nor make social life unpleasant.

There were other "neighborhood" witnesses, some for respondents, some for appellants. Miss Martin, a school teacher, residing at 156 Wentworth Street, stated that in her opinion that the value of respondent's property had been impaired by reason of the establishment of the funeral home by appellants; that such activities were depressing, and that the ordinary and average person would not buy property in close proximity thereto; that she would not purchase property adjoining appellants. A Mrs. Gibbon, who owns property in the immediate vicinity, but who resides on Rutledge Avenue, about one and one-half blocks from the property under discussion, said she would not buy next to the appellants because the activities there are a constant reminder of death. It was her opinion that the salability of nearby property would be diminished. Dr. A. P. Aimar, a druggist, 76 years of age, owner of and residing on a lot at the southeast corner of Wentworth and Rutledge Streets, less than a block from appellants' property, does not consider that the value of his property has been impaired by the use to which appellants are making of their property, and that the activities there do not depress or make nervous either him or the members of his family. J. C. McCue, residing at the northeast corner of Smith and Montague Streets, which is on the corner opposite the property of Mrs. Gibbon, a witness hereinbefore referred to, testified that activities carried on by the appellants had in no way affected him and his family, nor did he consider that the value of his property had been impaired. Joseph C. Thomas, 51 years of age, born and still living at 142 Wentworth Street, which is next door to the Red Cross building going east on Wentworth Street, testified that activities at the McAlister premises have not caused him or his family to be depressed or nervous, and have not decreased the value of his property. Dr. Josiah E. Smith, a practicing physician, owns the property at 48-b Smith Street (diagonally across from the premises of appellants), which is an apartment house. His tenants have never ob-

jected to the activities on the property of appellants, considers his property a good investment, and would have no objection to living next door to where the activities under discussion are conducted. Maier Triest testified that he is engaged in the business of real estate and insurance and lives on the corner of Rutledge Avenue and Wentworth Street; that this is a little more than one-half block, and the width of Rutledge Avenue and the width of Wentworth Street, from the western boundary line of the property of appellants; that he and his family have no objection to the activities conducted on the premises of appellants, and that he does not consider that the value of his property has been affected thereby.

There is a mass of opinion evidence by real estate brokers, both in and out of the City of Charleston; by medical doctors and by ministers of the gospel; the real estate brokers largely confining their testimony to the issue if the value of respondent's property had been impaired; the physicians' testimony, and that of the clergy being directed more to the physical and mental issue herein, that is, to issue No. 2. There were also a few miscellaneous witnesses.

We do not deem it necessary to detail the testimony of these witnesses. Suffice it to say that the testimony of respondent's witnesses was based almost wholly upon the theory that a goodly number of people shared their personal views, and would object to residing in close proximity to a funeral home, which as expressed by at least some of them, would be a constant reminder of death. Only one of the real estate brokers testifying for respondent had never known of such objection being made by a prospective purchaser, and he attributed his failure to make a sale of property to this one individual to the fact that a funeral home was in close proximity to the property sought to be sold. Of course, the prospective purchaser may have had other reasons unvoiced.

While definite and positive views and opinions were expressed, some that the "funeral home" of appellants had impaired the salability of respondent's property, and would cause the average person residing in such close proximity to be sad, nervous and depressed, yet other witnesses of the same professions, just as numerous, and equally qualified to express opinions, testified that the salability of respondent's property had not been affected, and that there was no basic reason for the presence of the funeral home to injuriously affect the respondent and his family in the enjoyment of their home. Of course, the testimony of the various witnesses, pro and con, was dependent upon their divers mental pictures and conceptions. The testimony on behalf of appellants at least balanced the testimony offered in behalf of the respondent.

Thus far, we have not mentioned that the respondent and members of his family testified tending to sustain the allegations of respondent's complaint, and that the appellant, James A. McAlister, although called as a witness by respondent, testified in the main in accordance with the allegations of the answer. It should also be mentioned that so far as the record discloses, the respondent is not desirous of disposing of his home.

The witnesses for respondent, in reply to the direct question if they were average and normal people, replied in the affirmative, but it avails nothing to characterize the respondent and his witnesses as "normal" and "average" people. Presumably the witnesses who testified for the appellants are normal and average people, too, but it adds nothing to the disposition of the problem before us to so describe them.

Without disparagement to the respondent, or any of his witnesses, we cannot accept the mental state of respondent and his asserted fear as to future impairment of health, and of depression as representing a normal consequence of the activities of the adjoining "funeral home." This is not to

say that the respondent and the members of his family have not truthfully expressed their mental reactions.

The effect of much of what is said by respondent and on his behalf, and the principal complaint deducible from the whole record and supported by adequate factual testimony, is that the objection of the respondent to the activities on the property of appellants rests mainly upon the relation of their business to the subject of death. Properly interpreted, the repeated references to the operation, of hearses, the attendance of bereaved people at the home, the transportation of bodies to and from the home, and the like, relate in the respondent's mind not so much to the physical operations that are conducted on the premises as to the fact that they have, as stated, relation to death.

It is this factor that seems to create the morbid or depressed states of mind described in the testimony. It is the contemplation of death which in the minds of the respondent and the members of his family affects their enjoyment of their home. Does this furnish a ground for judicial action to restrict the incidents of property ownership by the appellants?

Whether we adopt the view that relief could not be obtained by way of injunction without proof of the essential facts by clear and convincing testimony, or that merely a preponderance of testimony is sufficient, we cannot conclude from this record that the respondent has made out a case within the scope of his complaint, unless we define the case he attempts to make as a suit for injunction on the sole ground that the respondent himself, and not people generally living in the same vicinity, suffered such mental reactions from the contemplation of death and the handling of dead bodies as is involved in appellants' business as to interfere with his enjoyment of his home and to give rise to impairment of health due to worry and depression from that cause alone.

Directing ourselves to the specific issue last stated, we are unable to accept the view that because certain individuals

living in the vicinity of a funeral home suffer adverse mental reactions, while other people in the same vicinity suffer no such reactions, the former may have the business eliminated from the neighborhood without any showing of conditions that are unsanitary or in any respect repulsive or otherwise objectionable.

Every theological and spiritual concept denies to death the pervading atmosphere of morbidity and depression which the respondent asserts as the principal ground of his complaint in this case. Death is a state that is as normal as life itself. Whether a particular individual views it with fear and dread, or with the exultation that comes from the inborn conviction of a higher life that follows, or with an utter indifference founded on a rejection of the hope and belief of future life upon which Christianity rests, death is a normal and inevitable incident for which all the living must make preparation. To families of the ones who die there is inevitably the mourning that comes from the loss of the presence and companionship of loved ones; but the event of death itself creates social problems that are largely unrelated to the feelings and desires of the family, and that are represented through human history in the development of what is now the science of the mortician.

It is anomalous, to say the least, to cast the stigma of illegality on a business which touches so deeply the feelings of those who are bereaved, and that at the same time is so indispensable both to such persons and to the public at large, and that deals with a phase of life which an inscrutable Providence so far has denied us the capacity to understand while at the same time planting in our hearts a conviction that it is a step in the evolution of man to a higher (or lower) state.

The authorities of the general subject we are considering are numerous, and the results are divergent. Although the text writers classify these cases into a so-called majority group, in which injunctions against the maintenance of

funeral homes were granted, and into a so-called minority group, in which injunctions were refused, this classification vanishes when the cases are carefully analyzed. In the main they will be found collated in annotations in 23 A. L. R., 745, 43 A. L. R., 1171, and 87 A. L. R., 1061, each annotation being preceded by one or more reported cases on the subject.

In many of the cases in which injunctions were granted there were present factors which do not come into play in the present controversy. In some of them noxious odors and gases were emitted from the premises; in others the operation of a more or less public morgue was a factor in the situation; and in a considerable proportion of the cases which are pertinent here the testimony showed beyond question that the area in which the funeral home was to be conducted was a strictly residential area in the literal sense that large sums had been expended in the creation or maintenance of a residential subdivision, or that the area had acquired the characterization from its location in a section divorced from the commercial activities of the municipality, or that although there has been some slight intrusion of business the other essential factors of an exclusive residential area above indicated are still present.

And similarly in a number of the cases in which injunctions were refused there were factual considerations differentiating the cases from the facts of the present case.

A typical illustration of the need of a close analysis of the facts of each case for the purpose of determining the intent of the Courts of the respective jurisdictions is that of *Dillon v. Moran et al.,* 237 Mich., 130, 211 N. W., 67. Because of the holdings of the Michigan Supreme Court in several cases on the subject (cited in the annotations above referred to) the Michigan Supreme Court is generally classed as holding the so-called majority view that the maintenance of a funeral home in a residential district will be enjoined. In the case cited an injunction was granted on a finding of

fact stated as follows: * * * The testimony and the photographs introduced in evidence are convincing that the district is a strictly residential district. There are many substantial homes, some single dwellings, some duplexes, and some apartments; a few roomers are taken, and some of the places are rented. although in the main the homes are occupied by their owners. The particular district here involved has retained its residential character, although outside of it in some direction business has crept in and become the predominant factor. * * *"

But in the concurring opinion of one of the Justices, which by reason of the concurrence of other Justices of the Court became the majority concurring opinion, the following express limitation is stated:

"Funeral homes, during recent years, in great numbers have been removed from the business sections of cities, and have become established in purely residential districts.

"An undertaking business is not a nuisance *per se*, and where one has been allowed to establish itself and carry on business as such in a residential part of a town, no one may disturb its continuance. It must not be understood that any one, at any time, can complain of a funeral home in a residential section and compel its removal.

"With this addition I concur in the opinion of Mr. Justice Fellows in all respects "

And the Supreme Court of Kansas, too, which is classed in the so-called majority group, took pains in one of its more recent cases on the subject to emphasize by quotation from an earlier case that: " 'There is no fixed or arbitrary rule, however, governing cases of this kind. Each case must be determined by the facts and circumstances developed therein.' " *Hatcher v. Hitchcock*, 129 Kan., 88, 281, P., 869, 872.

In the case last cited, in which an injunction was granted, material facts were disclosed by the testimony that are not present in this case. One of the plaintiffs was the owner of a home next door to the funeral home. Adjoining the home

of this plaintiff. a distance of only seventy feet from the funeral home, was a hospital involving an investment of about a hundred thousand dollars. The establishment sought to be enjoined included a morgue. The report of the case discloses no contradictory testimony, such as appears in the present case, as to the effect of the presence of the funeral home on the persons living in the vicinity and on the value of the property in the vicinity.

Probably the most widely quoted case on this subject is that of *Westcott v. Middleton,* 43 N. J. (Eq.), 478, 11 A., 490, 492, affirmed without opinion, 44 N. J. (Eq.), 297, 18 A., 180. While the facts of that case are such as to render it readily distinuate, yet when the City authorities fail, and in effect refuse to take any action thereabout upon its being brought to their attention that the ordinance is being' violated, before an adjoining property holder may successfully maintain an action for injunctive relief, such property holder must show by the preponderance of testimony that he has suffered and will continue to suffer special damage not suffered by the general public. Such damage must be real and not merely speculative and imaginary.

Under the facts of this case, and applying the rule of reason, we must conclude that the respondent has failed to meet the burden of showing that he has suffered any form of special damage normally to be expected by reason of the activities of appellants in the use of their property.

It is therefore our opinion that the decree appealed from should be reversed; and the permanent injunction thereby granted, dissolved.

NOTE: The foregoing was written as and for the opinion of the Court. None of the other Justices having concurred therein, it becomes a dissenting opinion.